IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

ROBERT J. COSTA, Jr., et al          : No.  07-904

          vs.          : Electronically filed

                                :

COUNTY OF BURLINGTON, et al          :  Honorable Joel Schneider

MEMORANDUM IN SUPPORT OF MOTION TO COMPEL ON SITE INSPECTION

TO THE HONORABLE JOEL SCHNEIDER:

The Estate of Angel Powell Costa hereby files this Memorandum in Support of its Motion to Compel Discovery.

I.  HISTORY

Plaintiffs require an inspection of Burlington County Work Release center in order for their expert in sanitation and infectious disease to have a basis upon which to form an expert opinion.  Dr. Leon Vinci has been hired to examine numerous areas within the work release center and interview inmates and witnesses.

The parties have exchanged lengthy correspondence trying to come to an agreement on the inspection.  However these discussions have not been fruitful.  At the February 20, 2009 status conference the court directed the parties to design a protocol for

1

the inspection of the work release center.  On March 16, 2009, plaintiffs proposed the following protocol:

   1.  A one-day inspection will take place during the week when the facility has a full complement of staff.

   2.  A request for a plan of the building.

   3.  Visit the women's module that contains G & K cells.

   4.  Visit the day room, the hallways and the cell where the decedent was held.

   5.  Have access to the dimensions of the cell and module and visit the decedent's cell with a boat bed in it.

   6.  Examine drains, ventilation, showers, toilets, and taking measurements and photographs.  Photographs to be kept confidential under our previous agreements.

   7.  Look at the intake area and cells where Ms. Costa was held during her time in the clinic and when she was first brought into the facility.

   8. View the infirmary and the treating areas and the kitchen where her food was prepared.

   9. Witness how food is delivered to the women, the utensils they are allowed to use and the cleanliness of the trays and dishes.

10.  View the laundry area for the women, including records for the temperature of the water used for cleaning and the storage of dirty and clean linens throughout the facility.

The defendants have not responded with a proposed protocol and the plaintiffs request that this protocol be accepted by the court as a reasonable compromise.

## II. ARGUMENT

Discovery rules must be accorded a broad and liberal treatment. *Hickman v. Taylor*, 329 U.S. 495, 508 (1947).  Discovery should be permitted unless it is "Clear that the information sought has no possible bearing on the subject matter of the actions." *Dunkin Donuts Inc., v. Mary's Donuts, Inc.*, 2001 WL 34079319 (S.D. Fla November 1, 2001) unreported.  Fed. R. Civ. P. 26(c) allows the court to limit discovery if there is undue burden or expense.  The benefits of the proposed inspection under Rule 34 must be balanced against the burdens and dangers created by the inspection. *New York State Ass'n of Retarded Children, Inc. v. Carey*,  706 F. 2d 956, 961 (2d Cir. 1983).

In cases in which a site inspection has been allowed, the rationale has often been because the specific location relates to the subject matter of the cause of action.   In this case the plaintiffs allege that the conditions in the Burlington County Work Release Center were so brutal as to violate the decedent's constitutional rights. BCWRC was designed to house two thirds of the inmates it actually housed in 2005.   This has led to triple bunking, and other overcrowding problems, including the lack of basic sanitary supplies and the lack of humane medical isolation housing.  Increased number of MRSA infections, lack of constitutionally adequate medical care, and ongoing sanitation and

hygiene problems, presents unconstitutional inhumane prison conditions. *Foster v. Fulton County, Georgia*, 223 F. Supp. 2d 1292 (N. D. Ga. 2002); *Tillery v. Owens*, 907 F. 2d 418 (3d Cir. 1990); *Rhodes v. Chapman*, 452 U. S. 337, 101 S. Ct. 2392 (1981), holding that the Constitution prohibits depriving inmates of "basic human needs" or "the minimal civilized measure of life's necessities." Adequate heat, water, fresh air and sanitation are basic human needs.

This inspection is a necessary component of discovery in this case, the plaintiff is trying to uncover relevant material concerning whether the conditions in which Ms. Costa was held amounted to punishment of the inmate. *Bell v. Wolfish*, 441 U. S. 520 (1979). *Bell* dealt with the incarceration of pre-trial detainees. The complaint in this case alleges that the conditions of confinement violate the Constitution of the United Sates. The factors that convince the courts that incarceration in a jail violates the Eighth Amendment vary from case to case, but certain patterns are examined. The institution itself must be minimally adequate: lighting, heating, plumbing, ventilation, cell size and recreation space are all examined. *Tillery v. Owens*, supra.; *Laaman v. Helgemoe,* 437 F.Supp. 269, 322 -323 (D.C.N.H. 1977). Conditions of confinement may jointly establish an eighth amendment violation when they combine to produce a deprivation of a single, identifiable human need. *Wilson v. Seiter*, 111 S.Ct. 2321 (1991). We are looking here at the totality of the circumstances of the conditions under which Ms. Costa was held to determine if there was a constitutional violation.

The institution, and especially the food preparation and medical facilities, must be sanitary, and inmates must be provided with clean places to eat, sleep, work and play and the wherewithal to keep themselves and their cells clean. The jailors must provide

4

adequate clothing, nutrition, bedding, medical, dental and mental health care, visitation time, exercise and recreation. Each prisoner is entitled to a minimal amount of space. Idleness and obstructions to self-improvement are not tolerable.

a. Lack of Space

The Supreme Court held that the fact of double-bunking per se may not violate a prisoner's due process rights. See *Bell v. Wolfish*, 441 U.S. at 541-43. The Court explained that only the conditions of confinement provided "in such a manner as to cause [detainees] to endure genuine privation and hardship over an extended period of time" raises a due process concern. *Id.* at 542; see also *United States v. Sutton*, 2007 WL 3170128 (D.N.J. Oct. 25, 2007) (finding that overcrowding-related deprivations existed where the incarceration conditions included, inter alia, such hardships as: (a) triple overload of jail population; (b) presence of three toilet commodes, one urinal and four sinks per 64 inmates; (c) the fact of inmates eating while being sat on toilets; (d) frequent violence resulting from overcrowding; (e) severe fly and rodent infestation; (f) dire cold during winter and heat during summer; and (g) either complete lack of ventilation or inputs of fresh air accompanied by big clouds of fiber, dust and dirt); *Hennessey v. Atl. County Dep't of Pub. Safety* 2006 WL 2711510 (D.N.J. Sept. 18, 2006) (finding a possibility of overcrowding-related deprivations in view of the fact that the overcrowding claim was accompanied by allegations that the facility failed to medically screen inmate food handlers and forced the inmates to sit on toilets to eat meals).

In the instant case, it is clear that the overcrowded conditions which Ms. Costa suffered also violated numerous New Jersey state regulations under N.J.A.C. 10A:31-3.6,

5

et seq. , with respect to the conditions of confinement. New Jersey law requires that an inmate to be allowed a cell with 25 square feet of unencumbered space.  The authorities in this case have long admitted that the cell in which Ms. Costa sickened contained three women and that this overcrowding violated the New Jersey Code.  See the  deposition of Warden Jule Cole,  pp 191 and 192, attached as Exhibit 1, in which he admitted that the Administrative Code limits the number of inmates to two per cell.  Not only did the size of Ms. Costa's cell violate the law, but the Administrative Code also requires 35 square feet of dayspace per inmate and that there be provided sufficient seating and eating space. Corrections officers in this case have admitted at depositions here that because there were too many women in the module where Ms. Costa was kept, that women were often forced to take their meals at tables set up in the hallways of the housing units instead of in the day space.  One inmate has said she often ate sitting on the floor. Ms. Costa's cellmate says she slept with her feet only inches away from the toilet.  See affidavit of Kelly James,  attached as Exhibit 2.  The  New Jersey Administrative Code requires that the module contain 35 square feet of floor space per inmate exclusive of lavatories, showers and toilets, with a sufficient number of seating, writing, and eating surfaces.  These things the plaintiffs wish to view with their expert witness and the amount of space and facilities will not have changed from 2005 until today.

The plaintiffs wish to visit the cells where Ms. Costa was housed, including the cell in which she sickened.   We still do not have the measurements for the area where she lived and we are requesting a plan of the facility in order to prove that her living space was inadequate.   The witnesses in this case have testified that when three women were in the cell, that one was assigned to the boat bed on the floor, that there were less

than five or six inches from the bed to the toilet commode in the cell.   One inmate has
remembered that Ms. Costa was assigned to sleep on the floor. According to the officers,
one inmate would have to step over a fellow inmate when using the toilet in the middle of
the night. (See Wanda Houston deposition at p. 122, attached as Exhibit 3).   Courts in this
district have found that it is a unsanitary and humiliating practice of forcing detainees to
sleep on mattresses placed either on the floor adjacent to the toilet and at the feet of their
cellmates.  *Newkirk v. Shears*, 834 F. Supp 772 (3d Cir. 1993);  *Union County Jail
Inmates v. Di Buono* 713 F.2d 984, 996 (3d Cir.,1983) When there is simply no room to
move, the constitution may be violated.  This sort of condition was addressed by this
court in the case of *U.S. v. Sutton*, 2007 WL 3170128 (D.N.J. 2007).

    The plaintiffs also wish to observe other cells where Ms.Costa was held to
determine their size, and to measure and observe the use of the day space available in the
modules where she was held.

    Because lack of space, by and of itself has been held to be an insufficient test for
the constutionality of confinement, the plaintiffs are asking for leave of court to take their
expert through the facility to observe and measure the ventilation, sanitation, plumbing,
laundry, food preparation and medical services.  These other issues are not just coming to
us out of the blue.  Testimony has been taken that the plumbing tin the facility often
backed up, allowing sewage material to float up through the floor outside of the cell
where Ms. Costa was ill.  The officers testified that before the sewage came up, that
tissues and watery "stuff" would emerge from the drains in the wing where Ms. Costa
was housed.  Officer Harley testified that the sewage coming up through the drains in the
tier where Angel Costa was housed and that the sewage would flood everything.  " It

would even go in to the cells". See deposition at P. 23, attached as Exhibit 4. The drains backed up in the day space where the women inmates ate, and in the hallway outside of her cell. Angel's cellmate has given an affidavit indicating that Ms. Costa herself took her blanket and blocked the sewage from coming into their cell. See affidavit of Josephine Dionne attached as Exhibit 5. Sewage backing up into a cell certainly would make out a claim under the Eighth Amendment. Officer Harley testified that the inmates would not be able to get out of their cells without walking in sewage. In *Williams v. Adams* 935 F.2d 960, 962 (8th Cir.1991) a complaint was found sufficient to allege a violation of the eighth amendment whether it alleged, among other things, that the toilet in the cell did not work, and that it "continually [ran] over [and] leak[ed] onto the cell floor and the floor stay[ed] filthy with its wast[e]." We want to examine the plumbing system to see if it violates the Constitution. See also *Tillery v. Owens, supra.*

In the following cases involving challenges to the conditions resulting from the confinement of convicted prisoners in the general jail or prison population in cells housing three or more persons containing less than 30 square feet per inmate, the courts indicated that the resulting conditions violated the prisoners' federal constitutional rights. These cases are cited here to show the sort of issues which should be taken into consideration in deciding a conditions case and why this examination is necessary Thus, in *Jones v Diamond*, 636 F2d 1364 (5th Cir 1981), cert dis. 453 US 950, overruled on other grounds, *Block v. Rutherford*, 468 US 576, 82 L Ed 438, 104 S Ct 3227), *International Woodworkers of America, & its Local No. 5-376 v. Champion International Corp.*, 790 F2d 1174 affd 55 USLW 4820 (5th Cir, 1986), a class action under 42 U.S.C.A. § 1983 brought by prisoners in a county jail seeking declaratory and injunctive

relief, the court held that the combined impact of gross overcrowding at the jail, prisoners sleeping on filthy mattresses on the floor, stifling heat in summer, a diet consisting mainly of starches, and no outdoor exercise constituted cruel and unusual punishment as to convicted prisoners. The court noted that some inmates were held in three six-bunk cells and had only 11 square feet per person, including space occupied by tables and that sometimes during the day there was only 6.8 square feet of space per person, including table space.

In a class action brought by federal prisoners in a city jail, the court held, in *Johnson v. Lark,* 365 F Supp 289 (E.D. Mo. 1973) that the general living conditions in the jail, including the practice of confining three men in a two-person cell measuring approximately 8 feet long by 5 feet wide and 8 feet high, constituted a violation of their Eighth Amendment rights.  In *Hutchings v. Corum,* 501 F. Supp 1276 (1980, W.D. Mo.), it was found that it was constitutionally intolerable to house three or more prisoners in cells some of which provided less or apparently provided less than 35 square feet per inmate in a class action comprised of pretrial detainees and convicted inmates challenging the constitutionality of numerous conditions and practices at a county jail brought under 42 U.S.C.A. § 1983

In a class action brought under 42 U.S.C.A. §1983 on behalf of inmates housed in a county jail, the court held, in *Mitchell v. Untreiner*  421 F Supp 886 (N.D. Fla 1976) that the overcrowding in cells varying from 8 feet by 8 feet in certain four-bed cells to 24 feet 7 inches by 16 feet in 18-bed cells, unsanitary conditions, nonhygienic toilet facilities, lack of light and fresh air, inadequate medical care, inadequate staff to insure inmate safety, and the lack of recreational and educational opportunities present were so

extreme as to constitute cruel and unusual punishment as to convicted inmates.  In *Jones v Wittenberg,* 323 F Supp 93 (N.D. Ohio 1971), the court, without specifically addressing the maximum number of men per cell that would be unconstitutional, held that where, inter alia, as many as four bunks had been added to cells 6 feet by 9 feet in floor area, the total picture of confinement constituted cruel and unusual punishment as to convicted inmates in an action brought under 42 U.S.C.A. § 1983.   The court noted that the quarters were lightless, airless, damp, and filthy with leaking water and human wastes, and that there was slow starvation, deprivation of most human contacts, except with others in the same state, no exercise or recreation, little of any medical attention, and no attempt at rehabilitation.

   b.  Ventilation and water problems

        Here the plaintiffs want to examine the ventilation system with their sanitation expert, for it has been reported to them by corrections officers that complaints to PEOSH about mold and mildew caused by the leaking roof in the women's modules have been substantiated and cause problems in the ventilation system.  The roof in the facility has been leaking for years.  Officer Harley testified that OSHA found that the tiles in the women's module had mold on them.  The officers reported that there was black stuff on the walls in the day's space and television area where Ms. Costa was held.  Dust hangs from the ventilation system.  No one ever takes the covers off and cleans out the ventilation system.  (Exhibit 4 at p. 56)  Inmates complained to officers that they thought that the ventilation system made their asthma worse and Ms. Costa suffered from asthma. We want permission to examine the ventilation system in the work release center by taking the covers off of the vents and taking photographs.  The officers and inmates have

testified that it sometimes takes up to 15 minutes to get hot water in the cells.  We would like to examine that issue.  Because of problems with the heating system the boiler often malfunctions.

In *Jackson v Gardner,* 639 F Supp 1005 (E.D. Tenn, 1986), a class action under 42 U.S.C.A. § 1983 by inmates of a county jail challenging the constitutionality of the conditions of their confinement, crowding of inmates in cells with three or four others where the majority of those confined in cells averaged 20 square feet per inmate, including space in bunk areas and adjoining day area, was held a violation of the prohibition against cruel and unusual punishment as to the convicted prisoners under the totality of circumstances. The court noted that the lack of opportunity for regular outdoor recreation was exacerbated by the overcrowding and constant confinement to the cell areas with the result that the average inmate was confined 24 hours a day in a physically dilapidated, insect infested, dimly lit, <u>poorly ventilated area averaging</u> under 20 square feet per inmate, without any available recreation or diversion other than some reading or letter writing, sharing a shower with 12 to 14 others, sharing a sink and toilet, which may or may not be operable, with three or four others, possibly sleeping on the unsanitary floor, or within inches of the toilet, in clothes that may not have been recently washed. An examination of the physical plant for evidence of poor ventilation is relevant to the inquiry in this case. (emphasis added)

c.  Hot and Cold Temperatures

While the instant complaint does not allege that Ms. Costa's outdoor recreation was limited, there is much evidence that there was little or no hot water in the cells, that

11

her cell was abnormally cold, and that women in that wing would often appear shivering and blue. The water temperature in the laundry facilities was inadequate to kill bacteria. The plaintiffs wish to visit these areas with their expert witness. The officers have testified that they provided some of the coldest cells in Ms. Costa's cell block with extra blankets, but did not provide extra blankets for her even though she was in one of the coldest cells. (Exhibit 4 at p. 32-34). Costa wrote in her letters to her husband that she was extremely cold while she was suffering in her cell. Prisoners have a right under the Eighth Amendment to be free from extreme hot and cold temperatures." *Freeman v. Berge*, 2003 WL 23272395 (W.D.Wis., Dec. 17, 2003) (internal citations omitted). "The same Eighth Amendment standard applies to cell temperatures as to other conditions of confinement: whether the temperatures subject the inmate to a substantial risk of serious harm." In *Wilson v. Seiter*, 501 U.S. 294, 304, 111 S.Ct. 2321, 2327 (1991), the Supreme Court noted "[s]ome conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth or exercise-for example, a low cell temperature at night combined with a failure to issue blankets." Here the plaintiffs are asking for the opportunity to inspect the heating system in her module.

d. Inadequate Diet

In a class action by inmates of a county jail challenging numerous conditions of their confinement, the court held, in *Campbell v Cauthron,* 623 F2d 503 (8th Cir. 1980, that the confinement of convicted prisoners in cells measuring 14 feet by 10 feet or 14 feet by 11 feet with capacities of either six or eight inmates thus affording each inmate

12

when fully occupied approximately 18 to 26 square feet of living space including the space occupied by the bunks, the wash basin, and the toilet constituted cruel and unusual punishment. The court noted that most convicted felons were kept in their cells around the clock.  The court emphasized that unconstitutional conditions could not be permitted to exist simply because prison officials cannot or will not spend the money necessary to fulfill constitutional requirements.

    Ms. Costa complained in her letters to her husband that the women in the work release center were being fed undercooked potatoes and that she really missed having a cucumber or a tomato in her diet.  The records that have been provided to the plaintiffs indicate that the county had contracted to feed the women at a rate of $1.25 per meal and that Aramark was making a profit on that allowance.  The women were never given fresh meat, but only processed meat such as bologna, and the record shows that the food for the women was prepared in a kitchen some distance from the module whether they were served.  Officer Harley testified that the women would be served cold beans.  It is uncontroverted that by the time the food would reach the women in Ms. Costa's module, that the food was cold four or five days out of a week. The inmates describe the food as nasty and inedible.  As a great treat, the inmates are given chicken on a major holiday. The plaintiffs are also in possession of several inspection reports prepared by the Burlington County Department of Health in the days after Ms. Costa's death in which the health department found that the work release kitchen was filthy and badly operated.  The plaintiffs wish to examine the food preparation system in the work release center.  For inadequate diet and cold food can be part and parcel of the unconstitutional conditions in

which Ms. Costa was held. If the conditions in the kitchen were as bad now as they were in March 2005, it would be corroborative evidence of the conditions at the time.

e. Lack of Cleanliness and Cleaning Supplies.

In *Battle v. Anderson, 447 F. Supp 516* (E.D. Okla 1977), affd 564 F2d 388, (10th Cir. 1977) the court held that each inmate living in a cell should have a minimum of 60 square feet of sleeping space defined as the interior measurement of the cell divided by the number of inmates living in the cell. It was noted that at one prison four men were confined in 6 foot by 16 foot cells, and that the basic arrangement at another prison was the housing of two men in 5 foot by 7 foot cells or four men in 5 foot by 11 foot cells. 115-square-foot cell in which four inmates were placed, giving each about 29 square feet, may have violated Eighth Amendment if condition led to deprivation of essential needs, such as sanitation. *Karacsonyi v Radloff,* 85 F Supp 368, N.D. NY 1995). (emphasis added)

Many of the officers in this case have testified that the inmates had no way to adequately wash their cups and spoons, which is all that they are issued. The officers testified that the tier where Ms. Costa was housed often ran out of toilet paper. Her cellmate has given an affidavit indicating that she used her hands to wipe herself. The inspection will focus on the supplies that are kept in the module for the inmates, and that inspection should include cleaning supplies, for both the inmates and officers have testified or given affidavits that there were often no cleaning supplies such as disinfectant and hand soap. This could clearly be linked to the overcrowded conditions in the facility.

14

There simply were no supplies  to give to the inmates to clean their cells and the inmate
showers.  (Exhibit 3 at p. 125-127

  The defendants are specifically accused in this lawsuit of failure to clean the
facility, including the walls, floors and all surfaces in the facility, including the showers,
air vents, furniture and cells.  The defendants are charged with failure to repair, paint and
disinfect the facility, failing to provide sufficient sanitary supplies, such as toilet paper,
feminine products and failing to provide cleaning products.  (see 2nd Amended
Complaint.)  Proving that these deficiencies existed is a necessary component of the
plaintiffs' case.  Inspecting the prison is part of the proof.  When inspection is necessary,
the courts have so allowed.  See *McKesson Corp. v. Islamic Republic of Iran*, 185 F.R.D.
at 72 (holding that American company was entitled to inspect premises of Iranian dairy
facility because valuation of the facility was key to determining whether the Iranian
government had expropriated the American company's equity interest in the facility);
*Minnesota Mining and Mfg. Co., Inc. v. Nippon Carbide Indus. Co., Inc.*, 171 F.R.D. 246,
248-49 (D.Minn.1997) (holding that inspection of one of defendant's manufacturing
plants was justified upon the theory that a physical inspection of the plant was the most
efficient means of determining whether or not defendant was liable: *Eirhart v. Libbey-
Owens-Ford Co.*, 93 F.R.D. 370, 371 (N.D.Ill.1981) (holding that plaintiff in Title VII
action was entitled to inspect production line at one of defendant's factories because
cause of action was based on allegations that defendant's height and weight requirements
discriminated unlawfully against female applicants).  Requests for inspection under Rule
34 have also been litigated in other types of cases.  *Belcher v. Bassett Furniture Ind., Inc.*
588 F. 2d 904 (4th Cir 1978 (Employment discrimination); *Macort v. Goodwill*

*Industries-Makasota, Inc.*, 220 F. 2d. 337 (M.D. Fla 2003) challenges to mobility barriers under ADA).

Here we are proposing an inspection that will involve two people and will take just one day. The instant request herein is much less disruptive than those ordered in other institutional cases. See *Morales v. Turman*, 59 F.R.D. 157 (E.D.Tex., 1972) (Experts allowed to live on the premises). Though, as the defendant's points out, those inspections were allowed in class action litigation, the relevancy of the inspection is the same.

The Defendant County argues that too much time has gone by and that an inspection of the facility in 2008 is not relevant to the conditions in the prison in 2005. This is really an argument concerning the admissibility of the evidence and not strictly to relevance. In *Canty v. Great Lakes Transit Corporation*, 2 F.R.D. 156 (W.D.N.Y.1941), the plaintiff was permitted to inspect the vessel on which he was injured though more than two years had elapsed since the accident. The court in Canty opined:

> Defendant objects to allowing plaintiff an inspection and right to photograph certain portions of the vessel on the ground that more than two years have passed since the occurrence of the alleged accident. The court is not now passing on the admissibility of any evidence that may be obtained if the inspection and photographing were allowed. The court is only to determine the right of the plaintiff to make an inspection and to take photographs of relevant objects of property within the control of the defendant. Rule 34 should be liberally construed and motion is granted allowing plaintiff to inspect and photograph that portion of the vessel where plaintiff is alleged to have been injured.' (at page 156)

The trial judge will be able to determine at the time of trial whether or not this plaintiff has sufficient connected the dots between the expert's 2008 inspection and the condition of the prison at the time of the decedent's death. See *Mulligan v. Eastern S.S. Lines*, 6 F.R.D. 601, (S.D.N.Y 1946). *Carlson v. Chisholm-Moore Hoist Corp.,* 21

F.R.D. 144, 145 (S.D.N.Y.1957).  In order to show that the inspection is reasonably directed at uncovering relevant evidence, this plaintiff does not have to prove that all evidence will subsequently be admissible at trial.

The rules allowing inspections are to be construed liberally, indeed, inspections are to be allowed even in cases where the information was sought merely as background information and as corroboration for certain witnesses' testimony. In *Banks v. The Interplast Group, Ltd.*, 2003 WL 21185685  (S.D.Texas April 16, 2003), plaintiff sued his employer for sexual and racial harassment under Title VII.  In  granting plaintiff's motion for an inspection of his former workplace, the court stated the following:

> "Photographs can make the presentation of evidence on physical distances and locations much clearer and more concise than verbal testimony alone and can easily resolve factual disputes regarding these matters".

Counsel for the plaintiffs wishes access to the facility, if for no other reason than to clarify in their minds the layout and position of the parties in order to more clearly articulate the evidence to the jury.  Certainly it is necessary for the plaintiffs to know what the officer and supervisors in the prison should have been able to physically see as Ms. Costa lay dying in her cell.  Measurements must be taken of the cell, and of the area around the cell to determine how far away the officers were stationed, how far Costa had to go for help and to hear the level of noise in the facility to see if that could have obstructed the officers ability to help the decedent.  There are many more considerations of which the plaintiffs' counsel will not be truly apprised until they witness them at the time.

WHEREFORE,  the plaintiffs respectfully request that this Honorable Court order the defendant County to immediately grant plaintiff's request to inspect the

Burlington County Work Release Center following the protocol outlined in this

Memorandum.


                                        Respectfully submitted,

                                        /s/Andrew F. Schneider
                                        101 Mechanics Street
                                        Doylestown, Pa  18901
                                        215-348-5150


                                        Martha Sperling, Esquire
                                        Silver and Sperling
                                        148 E. State Street
                                        Doylestown, Pa  18901
                                        215-348-1666


Date:  4/30/09